## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT

IN RE:
**CHRISTOPHER T. SHALLOW**

        **Debtor**

**Chapter  7**

**Case No.  05-22323**

| | |
|---|---|
| **ANTON RICHARD SATTLER and SATTLER BUILDERS AND DECORATING CO., INC.** )<br>)<br>)<br>) | **Adversary Proceeding** |
|     **Plaintiffs** )<br>) | **No. 06-2018** |
|     v. )<br>) | |
| **CHRISTOPHER T. SHALLOW** )<br>) | |
|     **Defendant** )<br>) | |

**APPEARANCES:**

Ellery E. Plotkin, Esq.
Law Offices of Ellery Plotkin
777 Summer Street, 2nd Floor, Stamford, CT 06901
Counsel for Plaintiffs

Gregory F. Arcaro, Esq.
Brown, Paindiris & Scott, LLP
2252 Main Street,  Glastonbury, CT 06033
and
JoAnn C. Silvia, Esq.
Michalik, Bauer, Silvia & Ciccarillo, LLP
35 Pearl Street, Suite 300, New Britain, CT 06051
Counsel for Defendant-Debtor

## MEMORANDUM OF DECISION

**KRECHEVSKY, U.S.B.J.**

## I.

Anton Richard Sattler ("Sattler") and Sattler Builders and Decorating Co., Inc.[1], on February 23, 2006, filed a complaint against Christopher T. Shallow ("the Debtor"), debtor in a Chapter 7 bankruptcy case, seeking to have one claim held nondischargeable pursuant to Bankruptcy Code §523(a)(6) (willful and malicious injury) and a second claim held nondischargeable pursuant to §523(a)(2)(A) (fraud), (4) (defalcation of a fiduciary) and (6) (willful and malicious injury). The court held an evidentiary hearing on March 28, 2008, after which the parties filed memoranda of law and reply memoranda in support of their positions.

## II.

## BACKGROUND

The Debtor is an engineer who was, during the relevant time, employed full-time by Pratt and Whitney Corp. His avocation was renovating and restoring wooden boats, especially those built prior to 1973 by the now defunct Matthews Boat Company. The Debtor had owned and renovated at least one such boat, *Pipe Dream,* prior to the events at issue and had also done work on others' similar boats. The Debtor was a member of the Matthews Boat Owners Association (" M.B.O.A.") which held an annual rendezvous in Mystic, Connecticut. It was at such a rendezvous, in the late 1990's, that the Debtor met Sattler, another Matthews devotee, and the two became friends.

---

[1]  The parties have not specifically addressed the role of Sattler Builders and Decorating Co., Inc., Sattler's wholly-owned company. Because Sattler signed all contracts at issue in his individual capacity, the court will use the term "Sattler" to include Sattler Builders and Decorating Co., Inc. where appropriate.

*Marquesa*

In early 2002, the Debtor became interested in purchasing a Matthews boat, the *Marquesa*, from an unrelated third party seller, and approached Sattler for a purchase money loan.  Sattler agreed to lend the Debtor $140,000 and Sattler's attorney prepared a promissory note ("the note")and a security agreement, both of which the Debtor signed on April 15, 2002.  The note provided for monthly payments of interest only, at an annual rate of 9.5%, with a balloon payment of the principal at the end of two years.  To secure the note, the Debtor granted Sattler a security interest in the *Marquesa*.  The Debtor purchased the *Marquesa* with the proceeds.  The Debtor planned to live aboard the *Marquesa*, do major renovations to it, and obtain conventional financing to pay off the balloon note.

By the time the balloon payment became due in April, 2004, the Debtor had made substantial improvements to the *Marquesa*, but was not finished.  Sattler and the Debtor agreed to extend the note and security agreement for an additional year to April 16, 2005.  During that time, the Debtor was to try to put the *Marquesa* in saleable condition and sell it.

By late 2004, the Debtor was having financial difficulties and stopped making the interest payments due under the note.  In May, 2005, after receiving a letter from the Debtor's attorney notifying him that he was in default for nonpayment and for failing to list Sattler as an additional payee on his insurance policy, the Debtor relinquished possession of the *Marquesa* to Sattler.

### *Speculation* and *Sea Lark*

In 2003, Sattler owned two Matthews boats, the *Speculation* and the *Sea Lark*,

3

in need of repair. From his affiliation with M. 3.O.A., Sattler knew that the Debtor and his friend Hillary Farrell ("Farrell"), also a member of M.B.O.A., had done similar work on their own boats. Sattler, the Debtor, and Farrell, on November 4, 2003, signed a contract ("the *Sea Lark* contract" or "the contract") under which the Debtor and Farrell agreed to make certain repairs to the two boats in return for scheduled payments totaling $50,000. The contract further provides: "All materials including cover provided by owner [Sattler], all storage costs paid by owner, and scope of work ... to be completed by June 27, 2004." (Exh. 15 at 4.)

The *Speculation* and the *Sea Lark* were brought to Castle Marina in Chester, Connecticut, where the Debtor was also working on the *Marquesa*. The Debtor built tents, wooden frames covered with plastic shrinkwrap, to cover Sattler's boats. Work on *Speculation* primarily concerned repair and/or replacement of two engines and was substantially completed on or about the date specified in the contract, although some further work was needed due to problems discovered after launch. Work to be done on the *Sea Lark* was more extensive, requiring, *inter alia*, removal of planking and replacement of the rotted framing. For reasons discussed, *infra*, the Debtor and Farrell failed to complete work on the *Sea Lark* by the contract completion date. By late May, 2005, when Sattler took possession of the *Marquesa*, the relationship between the Sattler and the Debtor had deteriorated. The Debtor, at that time, decided he would not personally continue working on *Sea Lark*; Farrell would finish the scope of work under the contract. The Debtor, on July 13, 2005, filed his bankruptcy petition. Farrell continued working on *Sea Lark* through December, 2005 and Sattler made the postpetition contract payments directly to Farrell.

4

Sattler, in July, 2006, hired a marine surveyor, Barnaby Blatch ("Blatch"), who prepared a report ("the 2006 report") evaluating the *Sea Lark* and making recommendations as to the work needed to put the 1960 vessel into saleable condition. The 2006 report stated:

SUMMARY ...

The "*Sea Lark*" is a classic boat in its original configuration. Above the waterline the boat is in good basic condition and can be brought into excellent condition by re-finishing the bright work, replacing carpeting, flooring, curtains etc. The structure of the boat has held up well over the years but for the effects of bilge water on the frames and worm damage to the garboards.[2] The work undertaken to replace rotted frames and planking and to refasten the underwater hull will ensure many years of useful life. The plan to sheath the underwater hull with fiberglass will protect it against future worm attacks.

The boat must be brought into compliance with the law regarding anti-siphon protection for the fuel system and the separation of non-ignition protected devices from the engine compartment.

Additional recommendations pertain primarily to current electrical safety standards and to replacements in the engine exhaust system.

The boat should be inspected again when the work has progressed to completion.

CURRENT FAIR MARKET VALUE ...

I estimate that the retail value of "*Sea Lark*," after completion of the work that remains to be done, will be $110,000.

(2006 Report, Exh. 2 at 2.) The work outlined by Blatch included numerous items outside the scope of work set forth in the *Sea Lark* contract in order to bring the vessel into compliance with current requirements. Blatch testified that, because the cost of the recommended work could exceed $110,000, the value of the *Sea Lark* in July, 2006

---

[2] Garboards are planks on the outer hull of a wooden vessel next to the keel. http://www.marineterms.com/cgi-bin/insearchdictionary.pl

5

was "minimal." (Tr. at 129.)

## Bankruptcy Proceedings

On July 13, 2005, the Debtor filed a Chapter 7 bankruptcy petition. Sattler, on February 7, 2006, filed two proofs of claim ("the *Marquesa* claim" (claim #4) and "the *Sea Lark* claim" (claim #5)); and, on February 23, 2006, commenced the captioned adversary proceeding seeking to have such claims held nondischargeable.

Although, in his bankruptcy schedules, the Debtor listed the balance due on the note as a secured claim, Sattler's security interest in the *Marquesa* had never been perfected; consequently, Sattler's unperfected security interest in the *Marquesa* was subordinate to that of the trustee, who, pursuant to Bankruptcy Code §544(a), was entitled to the priority of a hypothetical lien creditor as of the petition date. Sattler alleges that, as a result of the Debtor's "willful and reckless disregard" of Sattler's interest in the *Marquesa*, the Debtor caused "malicious injury." (Compl. ¶16, 17.) Sattler contends that his security interest in *Marquesa* was unperfected because the Debtor failed to comply with provisions of the note and security agreement to list Sattler "as a first holder on the Title of Ownership filed with the Connecticut Department of Motor Vehicles" (Exh. 5 at 1(note); Exh. 4 ¶1(sec. agree.)); and that the Debtor caused "physical damage and disrepair" to the *Marquesa*. (Compl. ¶17.) Count One of the complaint seeks to have the *Marquesa* claim held nondischargeable under Bankruptcy Code §523(a)(6) (willful and malicious injury).

In Count Two of the complaint, Sattler avers that the *Sea Lark* claim is nondischargeable under §523(a)(2)(A) (fraud), (4) (defalcation of a fiduciary) and (6) (willful and malicious injury). The Debtor acknowledges breaching the contract to

6

repair the *Sea Lark*, but contends that the *Sea Lark* claim is not excepted from discharge.

Sattler completed the work needed to prepare the *Marquesa* for sale and assisted the trustee in locating a buyer. The trustee subsequently sold the *Marquesa*, the only nonexempt asset in the Debtor's bankruptcy estate, for $177,000. The Court, on June 29, 2006, approved the trustee's motion to compromise Sattler's claims against the estate, and the trustee made distributions to Sattler as follows[3]:.

| Description | Sattler's Proof of Claim | Allowed Claim | Distribution |
|---|---|---|---|
| *Marquesa* Claims (proof of claim #4 filed by Sattler): | | | |
| Administrative Claim: For post-petition repairs needed to enable sale | $ 90,492.10 | $ 42,000.00 | $ 42,000.00 |
| Secured Claim: Maritime lien for Sattler's prepetition repairs | 85,296.54 | 27,724.90 | 27,724.90 |
| Unsecured Claim: Balance on note with unperfected lien | 178,803.27 | 165,968.13 | 45,481.83 |
| *Marquesa* Subtotal | $ 354,591.91 | $ 235,693.03 | $ 115,206.73 |
| *Sea Lark* Contract Claims (proof of claim #3 filed by plaintiffs) | | | |

---

[3] The Court takes judicial notice of the following documents filed with this Court in the Debtor's bankruptcy case. "Sattler's Proof of Claim" indicates amounts from proofs of claim #4 (*Marquesa*) and #3 (*Sea Lark*). "Allowed Claim" amounts are from the Order Approving Compromise (Doc. #105). "Distribution" amounts for administrative and secured claims are from the Order Granting Motion for Disbursement (Doc. #124); and for unsecured claims are from the Trustee's Final Distribution Report (Doc. #142).

| | | | |
|---|---|---|---|
| **Unsecured Claim:** | 122,273 38 | 75,500.00 | 20,689.99 |
| **TOTAL** | $  476,865.29 | $  311,193.03 | $  135,896.72 |

The only other creditor to file a proof of claim against the Debtor's estate was American Express Centurion Bank which received a distribution of $3,014.08. The balance of the proceeds from the sale of the *Marquesa* was applied to pay administrative expenses (trustee's fee, attorney's fees and accounting fees) of the estate.

## III.

## DISCUSSION

### Burden and Standard of Proof

The burden of proof in a nondischargeability proceeding is on the creditor seeking an exception to discharge to prove, by a preponderance of the evidence, that its claim satisfies the requirements of one of the discharge exceptions enumerated in Bankruptcy Code §523(a). <u>Grogan v. Garner</u>, 498 U.S. 279, 286, 111 S. Ct. 654 (1991). Further, "exceptions to dischargeability are narrowly construed, an approach that implements the fresh start policy of the Bankruptcy Code." <u>National Union Fire Insurance Co. of Pittsburgh, Pa. v. Bonnanzio</u> (<u>In re Bonnanzio</u>), 91 F.3d 296, 300 (2d Cir.1996) (citations and quotation marks omitted).

### Section 523(a)(6) - Willful and Malicious Injury

Sattler seeks to have both the *Marquesa* and the *Sea Lark* claims held nondischargeable pursuant to Bankruptcy Code §523(a)(6) as debts "for willful and malicious injury by the debtor to another entity or to the property of another entity."

> The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional <u>injury</u>, not merely

8

a deliberate or intentional <u>act</u> that leads to injury. . . . [The (a)(6) exception to discharge is analogous to] the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend the <u>consequences</u> of an act, not simply the act itself.

[A] more encompassing interpretation could place within the excepted category a wide range of situations in which an act is intentional, but injury is unintended. . . A knowing breach of contract could also qualify. A construction so broad would be incompatible with the well-known guide that exceptions to discharge should be confined to those plainly expressed.

. . .

We hold that debts arising from recklessly or negligently inflicted injuries do not fall within the compass of §523(a)(6).

<u>Kawaauhau y. Geiger</u>, 523 U.S. 57, 61-64, 118 S. Ct. 974 (1998) (citations and internal quotation marks omitted).

Sattler presented photographic and documentary evidence and testified extensively concerning the details of the work done (and not done) on the *Marquesa* and the *Sea Lark*. Nevertheless, nothing presented gave any indication that the Debtor undertook any of the conduct complained of for the purpose of inflicting harm on Sattler. The Debtor acknowledges that he defaulted on both the note and the contract to repair the *Sea Lark*, but denies any intent to harm Sattler. The Debtor explained that he defaulted on the note because he encountered financial difficulties and was unable to obtain the refinancing he had intended to use to pay the balloon payment. The Debtor admits that he did not comply with the provisions of the note and security agreement that he list Sattler as lienholder on the "certificate of title" and insurance policy, but denies that such noncompliance was intended to cause harm. Photographs put into evidence by both parties establish that, although the Debtor did not complete the planned renovations to either *Marquesa* or *Sea Lark*, he had done a substantial amount of work on both.

9

Blatch, Sattler's marine surveyor, testified that he examined the *Sea Lark* in 2006 and found no evidence of any deliberate abuse (Tr. at 133.); that all work had been done in a workmanlike manner (*id.*); and that the disassembly of the *Sea Lark* that Sattler complained of was a necessary step in replacing the rotted wood framing (*id.*). Sattler claims that the *Sea Lark* was damaged by humidity caused by its enclosure in the shrink wrap structure for an extended period of time. Blatch testified that such enclosures are "a normal thing in the marine business." (Tr. at 122.) The Debtor had installed zippered doors on both sides of the enclosure "to allow air flow" as well as an access door at one end (Tr. at 218); he testified that "[t]hey were left open unless the weather was bad." (Tr. at 53.) The Debtor stopped working on the *Sea Lark* in May, 2005. Nevertheless, Sattler continued to keep the *Sea Lark* inside the shrink wrap enclosure until October, 2006. Blatch testified that, when he inspected the boat in July, 2006, he the enclosure was hot, humid, and poorly ventilated. (Tr. at 122-123.) Sattler has offered no evidence that the humidity damage complained of occurred while the *Sea Lark* was in the Debtor's care rather than Sattler's. Sattler's contention that the Debtor enclosed the *Sea Lark* in the shrink wrap tent in order to cause damage lacks evidentiary support and is contrary to the evidence produced as to Sattler's own conduct.

Sattler alleges that the Debtor's removal of the bow pulpit[4] from the *Marquesa* was illustrative of "a pattern of intent to damage the Plaintiff." (Sattler's Brief at 7.) Sattler's contention is unsupported by the evidence. The Debtor explained that he had

---

[4]  The bow pulpit was a platform and railing that extended beyond the bow of the boat and was used to support the anchor.

removed the bow pulpit in order to repair, not damage, the *Marquesa*. He had intended to replace it because "it was installed improperly and it was leaking and it was causing further deterioration to the bow of the boat.." (Tr. at 33.) Although the Debtor had not finished his work on the bow pulpit prior to turning the *Marquesa* over to Sattler, his stated intent is consistent with the evidence that he had already replaced portions of the decks to stop them from leaking into the cabin, and had replaced the cabin molding which had deteriorated from the leaks. (Tr. at 37.) The Debtor had also made other substantial improvements to the *Marquesa*, including installation of a completely new galley and replacement of the entire heating system. Sattler seeks to dismiss such renovations as being for the Debtor's own benefit. The court finds that the work of the Debtor, who had planned originally to renovate the *Marquesa* and live aboard it, and later to sell it to pay off the note, was intended not to cause harm to the boat (or to Sattler), but to improve it, thereby not only conferring a benefit on himself, but enhancing the value of Sattler's security interest as well.

Sattler was aware from the outset of their relationship that the Debtor's interest in wooden boats was his avocation and that the Debtor was employed full-time as an engineer. (Tr. at 202.) The Debtor explained that a project, on which he was working for his employer, had turned out to be more complex than he had anticipated and required him to make numerous extended trips to Poland, leaving him with far less time to spend working on the boats than he had expected. (Tr. at 55.) As a result, he had been unable to devote as much time as he had expected to the *Sea Lark* project; the Debtor explained that the parties had anticipated that the *Sea Lark* project would provide a source of income for Farrell, who was unemployed at that time and was

11

expected to do most of the work. (Tr. at 41.)

The Court also finds unsupported Sattler's argument that the Debtor's noncompliance with the title requirements of the *Marquesa* note and security agreement, both drafted by Sattler's attorney, caused Sattler to lose his secured status. First, Connecticut is not a title state for boats; because neither the Department of Motor Vehicles nor any other state agency issues any title document for a boat, it was not possible for the Debtor to comply with the provisions that he list Sattler as lienholder on the "Title of Ownership filed with the Connecticut Department of Motor Vehicles." (Exh. 5 at 1(note); Exh. 4 ¶1(sec. agree.)) Furthermore, perfection of a security interest in a federally documented vessel is determined by federal, not state, law. <u>Maryland Nat'l Bank v. The Vessel Madam Chapel</u>, 46 F.3d 895, 900 (9th Cir. 1995); <u>See, also</u> <u>In re Alberto</u>, 823 F.2d 712, 715 -716 (3d Cir. 1987) (same). Sattler's security interest in *Marquesa* could have been perfected only by filing "with the Secretary of Transportation" in accordance with 46 U.S.C. §31321, and nothing in the note or security agreement required the Debtor to take such action. On the contrary, the plain language of the security agreement specifically authorizes Sattler to take whatever steps may be necessary to perfect his security interest:

> I[5] will provide, at no cost to you, whatever signed documents <u>you</u> need to establish and protect your Security Interest in the Vessel. I also authorize <u>you to prepare</u> and sign these documents in my name <u>and file or record them with the proper governmental agency</u>. If you wish to file a financing statement, you may do so without my signature on the statement. If you wish to record this Agreement, or any other related document, you may do so and I will pay all fees and taxes you may be charged.

---

[5]  The security agreement states that "I" to refers to the Debtor and "you" refers to Sattler.

(Exh. 4 ¶5 (emphasis added).)  The Debtor testified that none of the boats he had owned prior to the *Marquesa* had ever been encumbered by a lien; that he had no knowledge of how to effectuate such a lien; and that he had thought that Sattler's attorney, who prepared all the paperwork for the transaction, had taken care of it. (Tr. at 213.)

The Court finds that  providing Sattler with the title certificate he sought was not possible and that the security agreement did not require the Debtor to take any steps that would have perfected Sattler's security interest under the federal statute. The Debtor not only did nothing deliberate to cause the the lack of perfection, but  was not even aware of it. (Tr. at 216.)

Insofar as the insurance coverage is concerned, the Debtor maintained the insurance coverage as required, except for a short gap in coverage when premium notices were sent to the wrong address after the Debtor moved. (Tr. at 27.)  The Debtor admits that he neglected to list Sattler as loss payee on the policy.  The failure to do so, however, was not the cause of any harm to Sattler.  No insurable event took place while the Debtor owned the *Marquesa*;  and whether Sattler was listed as loss payee was irrelevant to the unperfected status of his security interest.

Sattler has established only that the Debtor defaulted on the note and breached the *Sea Lark* contract, both of which the Debtor concedes.  The court need not consider whether Sattler has shown negligence on the part of the Debtor because negligence, even reckless negligence, is not grounds for nondischargeability of a debt under §523(a)(6).  Sattler has not proved that the Debtor had any intent to cause injury to Sattler, the *Marquesa*, or the *Sea Lark*;  without such intent, the debt is not excepted from discharge under §523(a)(6).

13

### Section 523(a)(2)(A) - False Representation

Section 523(a)(2)(A) excepts from discharge "any debt ... for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by ... false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." Under well-established §523(a)(2)(A) principles, the plaintiff bears the burden of proof on each of the following five elements ("the five elements"):

> (1) the debtor made the representations; (2) at the time he knew they were false; (3) he made them with the intention and purpose of deceiving the creditor; (4) the creditor relied on such representations; (5) the creditor sustained the alleged loss and damage as the proximate result of the representation having been made. . . . To be actionable, the debtor's conduct must involve moral turpitude or intentional wrong; mere negligence, poor business judgment or fraud implied in law (which may exist without imputation of bad faith or immorality) is insufficient.

Universal Bank, N.A. v. Owen (In re Owen), 234 B.R. 857, 860 (Bankr. D.Conn. 1999) (quoting AT&T Universal Card Services Corp. v. Williams (In re Williams), 214 B.R. 433, 435 (Bankr. D. Conn. 1997)).

Sattler alleges that, at the time the *Sea Lark* contract was signed, the Debtor knew that it could not be completed on schedule and misrepresented that it would be. Sattler argues that the Debtor knew, but failed to disclose, that he would be unable to devote sufficient time to the *Sea Lark* project because of his frequent business travel to Poland, and that Farrell was unlikely to meet the contract deadline without the Debtor's constant supervision. Sattler acknowledged that he was aware that the Debtor was employed full-time as an engineer and that his work involved some travel (Tr. at 202-203), but contends that the Debtor misled him by not disclosing the extent to which he would be required to travel to Poland. The Debtor testified that: "Mr.

14

Sattler knew I had gone to Poland at the time we signed the contract. We were friends, we talked about things like that. The fact of the matter is I did not know that I was going to be asked to travel as much as I did." (Tr. at 57.) Sattler also testified that, before entering into the contract, he was aware of Farrell's reputation for starting projects and not finishing them. (Tr. at 153.) Yet, nothing in the contract required the Debtor to supervise Farrell's work or to personally perform any of the enumerated tasks. The Debtor testified that, because Farrell was unemployed and had more time to devote to the project, the parties expected Farrell to perform most of the labor. (Tr. at 62.)

Sattler has established only that the Debtor breached the *Sea Lark* contract, which the Debtor admits. Sattler has not, however, met his burden of proof under §523(a)(2)(A) either that the Debtor was aware, at the time the contract was executed, that he would not be able to meet the deadline, or that Sattler, who admits to knowing about the Debtor's employment and Farrell's work habits, relied on the alleged representations or omissions. As noted, *supra*, "poor business judgement and unreasonable expectations for the future" are not sufficient grounds for an exception to discharge under §523(a)(2)(A).

### Section 523(a)(4) - Defalcation of a Fiduciary

Sattler also seeks to have the *Sea Lark* claim held nondischargeable pursuant to Bankruptcy Code §523(a)(4) as a debt "for fraud or defalcation while acting in a fiduciary capacity." "The question of whether a defalcation has occurred is reached only when the threshold determination that the debtor acted in a fiduciary capacity has been made." The Andy Warhol Found. for Visual Arts, Inc. v. Hayes (In re Hayes), 183

15

F.3d 162, 170 (2d Cir. 1999).

> [S]tate law can be an important factor in determining whether someone
> acted in a fiduciary capacity under Section 523(a)(4). On the other hand,
> there are federal limits on the ability of state law to expand the effects of
> this provision. As a general matter, therefore, federal law sets the outer
> boundaries of the defalcation exception, while state law may, through
> lesser or greater regulation of fiduciary obligations, affect the
> application of the provision.

*Id.* at 166-67 (citations omitted). Sattler argues that, at the time they entered into the

*Sea Lark* contract, the parties had a relationship of trust and that, because of Sattler's

reliance on the Debtor's technical skills, the Debtor acted in a fiduciary capacity. The

Connecticut Supreme Court has rejected such reasoning:

> [T]he parties were strangers and stood at arms length in the matter of
> contract.... The defendant had not by being a friend become the
> guardian of the plaintiff's interests in any such sense as to impose upon
> him a legal duty to sacrifice his own to theirs.
> . . .
> The fact that one business person trusts another and relies on the person
> to perform its obligations does not rise to the level of a confidential
> relationship for purposes of establishing a fiduciary duty.
> . . .
> If we were to agree with the plaintiff, all parties that possess a superior
> technical skill, including electricians, plumbers and mechanics, would
> owe a fiduciary duty to their clients. Accordingly, we conclude that the
> plaintiff has failed to establish that the defendants owed it the duty of a
> fiduciary.

Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 255 Conn. 20, 39-42 (2000) (citations omitted).

The Debtor's relationship to Sattler under the *Sea Lark* contract was analogous to that

of a mechanic, electrician, or plumber to his clients. Because such a relationship does

not entail a fiduciary duty even under the more expansive state law interpretation, the

court concludes that the Debtor was not a fiduciary of Sattler in the more restrictive

limits applicable to the term "fiduciary" under Bankruptcy Code §523(a)(4). Having

concluded that the Debtor was not a fiduciary of Sattler, the court need not reach the

16

question of whether a defalcation occurred. The *Sea Lark* claim is not excepted from
discharge under §523(a)(4).

## IV.

## CONCLUSION

In accordance with the foregoing discussion, the court concludes that the Debtor

is discharged from both the *Marquesa* claim and the *Sea Lark* claim. Judgment shall

enter for the Debtor on both counts of the complaint.

Dated at Hartford, Connecticut this ⁻⁻ ⁵ day of August, 2008.

**ROBERT L. KRECHEVSKY**
**UNITED STATES BANKRUPTCY JUDGE**

17